IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ALBERT J. WATTS,

      Plaintiff,

v.                                CASE NO. 2:07-cv-00519

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. Both parties have consented in writing to a decision by the United States Magistrate Judge. Although court records show the U. S. Attorney's Office contacted Plaintiff's counsel once by telephone call on June 30, 2008, and twice by correspondence dated September 10, 2008 and October 28, 2008, about the filing of a brief in this matter, none has been filed. Consequently, the Commissioner also has not filed a brief.

Plaintiff, Albert J. Watts (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on October 14, 2003 and November 20, 2003, alleging disability as of August 26, 2003, due to anxiety attacks, panic disorder, sleep disorder, back injury

and knee pain.  (Tr. at 13, 86-88, 96, 113-19, 120-27, 396-98.)
The claims were denied initially and upon reconsideration.  (Tr. at
13, 66-68, 72-74, 400-02, 406-08.)  On July 6, 2004, Claimant
requested a hearing before an Administrative Law Judge ("ALJ").
(Tr. at 75.)  The hearing was held on November 3, 2005 before the
Honorable William B. Lissner.  (Tr. at 26, 32-49.)  By decision
dated December 8, 2005, the ALJ determined that Claimant was not
entitled to benefits.  (Tr. at 13-20.)  The ALJ's decision became
the final decision of the Commissioner on July 31, 2007, when the
Appeals Council denied Claimant's request for review.  (Tr. at 6-
9.)  On August 21, 2007, Claimant brought the present action
seeking judicial review of the administrative decision pursuant to
42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a
claimant for disability benefits has the burden of proving a
disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir.
1972).  A disability is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable impairment which can be expected to last for a
continuous period of not less than 12 months . . . ."  42 U.S.C. §
423(d)(1)(A).

The Social Security Regulations establish a "sequential
evaluation" for the adjudication of disability claims.  20 C.F.R.
§§ 404.1520, 416.920 (2002).  If an individual is found "not

2

disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to

perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 15.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of depression, anxiety, sleep apnea, and degenerative disc disease at L5-S1. (Tr. at 15-17.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17.) The ALJ then found that Claimant has a residual functional capacity for medium work, reduced by nonexertional limitations. (Tr. at 18-19.) As a result, Claimant cannot return to his past relevant work. (Tr. at 19.) Nevertheless, the ALJ concluded that Claimant could perform jobs which exist in significant numbers in the national economy. (Tr. at 20.) On this basis, benefits were denied. (Tr. at 20.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

"evidence which a reasoning mind would accept as sufficient to support a particular

4

> conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was 49 years old at the time of the administrative hearing. (Tr. at 35.) He completed two years of college. (Tr. at 35.) In the past, he worked as a heavy equipment (dozer) operator and other jobs for Hobet Mining for twenty-seven years. (Tr. at 37, 40-41.) He also worked as a car salesman for three years. (Tr. at 45.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

5

Physical Evidence

On July 7, 1988, Robert W. Lowe, M.D. advised Hobet Mining that Claimant had been placed in a lumbosacral support and should be restricted from heavy work for at least three weeks and would be rechecked in three weeks. (Tr. at 131.)

On July 22, 1988, Dr. Lowe advised Hobet Mining that Claimant was getting along well but advised light duty for an additional three weeks, followed by regular duty. (Tr. at 128.)

On June 7, 1995, Claimant was admitted to Williamson Memorial Hospital with complaints of vomiting, diarrhea, weakness and dizziness. Claimant was diagnosed with acute duodenal ulcer and antral gastritis. He was discharged on June 9, 1995 with medications and orders for a bland diet. (Tr. at 132-59.)

On December 13, 1996, Claimant underwent an echocardiogram at Williamson Memorial Hospital. It was interpreted by M. Shahbaz Mian, M.D., who found: "No significant pericardial effusion is seen. Conclusion: Normal left ventricular systolic function. Mildly dilated right-sided chambers. Mild tricuspid regurgitation with mild pulmonary hypertension." (Tr. at 178-79.)

On December 8, 2003, Claimant underwent a colonoscopy at Logan Regional Medical Center due to diarrhea complaints. The post operative diagnosis was "normal appearing colon, internal hemorrhoids, two small rectal polyps." (Tr. at 187.) Tamer Atassi, M.D. performed the procedure and stated that biopsies were obtained

and that Claimant tolerated the procedure well.  (Tr. at 188.)

On December 20, 2003, Claimant underwent an MRI of the lumbar spine without contrast.  Kenneth W. Sells, D.O. reviewed the results and opined:  "Combination of bulging or early herniation of discs and spondylosis indenting the left sided nerve roots and ventral border of the thecal sac at L5-S1.  Degenerative dehydrated disc at L5-S1."  (Tr. at 185.)

On December 29, 2003, at Logan Regional Medical Center, Claimant underwent a esophagogastroduodenoscopy with biopsies due to complaints of persistent heartburn.  Following the procedure, Tamer Atassi, M.D. diagnosed Claimant with erosive esophagitis. (Tr. at 181-82.)

On January 13, 2004, W. Roy Stauffer, M.D. of Story Consulting Services, Inc., provided a consultative examination of Claimant. (Tr. at 209-13.)  Dr. Stauffer made the following conclusions:

> Diagnostic Impression:
> 1.    Chronic low back pain.
>       a) History of degenerative disk disease and
>       degenerative joint disease.
> 2.    History of panic attacks.
> 3.    History of gastroesophageal reflux disease
>       ("GERD")...
> Medical Source Statement:  On a recent MRI, the claimant
> did seem to have significant back problems.  Therefore,
> I think his objective findings are consistent with his
> history.  Therefore, in taking into account the above
> objective  evidence,  I  feel  the  claimant  could
> occasionally lift 50 pounds; frequently lift 25 pounds;
> stand and walk six hours in an eight-hour day; sit six
> hours in an eight-hour day.  He could probably push or
> pull unlimited.  He might have some difficulty with
> ladder, rope, and scaffold climbing but no problems with
> stooping, kneeling, crouching, or crawling.  He would not

have any manipulative, visual, communicative, or environmental limitations.

(Tr. at 211.)

On February 10, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work without postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 220-27.) The evaluator, Diane Winterfeld, noted that lumbar spine x-rays from January 13, 2004 showed mild degenerative joint disease with spurring and that Claimant had been diagnosed with panic attacks and GERD. (Tr. at 227.)

Records from Logan Regional Medical Center dated January 19, 2003, January 29, 2003, and February 27, 2004, indicate Tamer Atassi, M.D. and Mohsin Gangi, M.D. treated Claimant for Irritable Bowel Syndrome ("IBS"), diarrhea, erosive esophagitis, bleeding ulcers and GERD. (Tr. at 235-46.)

Records from Saint Francis Sleep Center dated March 5, 2004, March 10, 2004, and April 2, 2004, indicate Mahendra M. Patel, M.D. treated Claimant for excessive daytime sleepiness and fatigue. (Tr. at 266-69.) Dr. Patel diagnosed Claimant with obstructive sleep apnea with severe daytime hypersomnia, hypertension and GERD. (Tr. at 268.) On April 2, 2004, Dr. Patel found the claimant had a good response to CPAP [Continuous Positive Airway Pressure]. He concluded that with "CPAP treatment every night 7-8 hours (that) Patient's day time sleepiness, blood pressure control and reflux

8

symptoms should rapidly improve.  Follow up in sleep clinic is needed to check for compliance to CPAP therapy." (Tr. at 266.)

On March 31, 2004, Frederick H. Armbrust, M.D., a neurologist, examined claimant related to his low back pain. (Tr. at 270-72.) He concluded:

> MRI scan dated December 20, 2003 revealed degenerative disc disease at the L5-S1 level with central disc herniation with end plate changes without any obvious nerve root compression.
> Impression:  Lumbar spondylosis.
> Recommendation:  The character of this patient's complaints would dictate a conservative approach with use of anti-inflammatory medication and other symptomatic treatment.  I do not feel that the patient is a candidate for any type of surgical intervention since he does not have any radicular pain, has no neurologic deficit, and his MRI scan did not demonstrate any evidence of compressive abnormality.

(Tr. at 272.)

On May 6, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work with the ability to frequently stoop, kneel, crouch and crawl, and to occasionally climb and balance.  The evaluator found no manipulative, visual, or communicative limitations.  Environmental limitations were unlimited except to avoid concentrated exposure to extreme cold and vibration and to avoid even moderate exposure to extreme heat. (Tr. at 273-80.)  The evaluator, M. G. Lambrecht, M.D. noted that Claimant had "back pain and evidence of lumbar spondylosis but no radiculopathy. Also had sleep apnea, demonstrated on polysomnogram.

9

Has been started on CPAP with very quick improvement.  He has mild hypertension and mild obesity with BMI of 32.   RFC [residual functional capacity] has been reduced."  (Tr. at 278.)

On October 22, 2004, Ashok K. Patnaik, M.D. performed a left heart catheterization, coronary angiogram and left ventriculogram on Claimant at Williamson Memorial Hospital.  (Tr. at 383.) Records from Dr. Patnaik indicate Claimant experienced chest pain and received treatment for cardiac care on October 21, 2004, September 20, 2004, and September 3, 2004. (Tr. at 384-88.)

On February 5, 2005, Claimant presented to Williamson Memorial Hospital with cold symptoms.  (Tr. at 310-20.)  He was diagnosed with bronchitis and vertigo and prescribed antibiotics, an inhaler, and cough suppressant.  (Tr. at 320.)

Records from Tamer Atassi, M.D. indicate he treated Claimant for anxiety, panic attacks, IBS, diarrhea, GERD, and esophagitis on July 12, 2005, February 8, 2005, and November 7, 2004.  (Tr. at 389-94.)

Records from Logan Regional Medical Center dated September 22, 2005, August 23, 2005, July 21, 2005, March 23, 2005, February 17, 2005, February 3, 2005, January 20, 2005, July 29, 2004, July 1, 2004, and June 7, 2004 indicate Ramanathan Padmanaban, M.D. treated Claimant for left knee osteoarthritis, left knee post traumatic synovitis and left knee effusion.  (Tr. at 321, 369-82.)   In the February 17, 2005 report, Dr. Padmanaban advised that he didn't

10

think knee surgery was necessary.  (Tr. at 373.)   During the
September 22, 2005, August 23, 2005, and July 1, 2004 evaluations,
Dr. Padmanaban also treated Claimant for lower back pain and lumbar
strain with lumbar bulging disc. (Tr. at 369-82.)

Psychiatric Evidence

On September 20, 2001, David K. Walker, M.D., a psychiatrist
with Family Psychiatric Services, provided a psychiatric intake
evaluation of Claimant.  (Tr. at 206-08.)  Dr. Walker opined:

> Impression:
> Axis I:   1. Major depressive disorder, single episode,
>              in remission, DSM-IV 296.25.
>           2. Anxiety disorder, not otherwise specified,
>              DSM-IV 300.00.
> Axis II:  No diagnosis.
> Axis III: The patient is in good physical health.
> Axis IV:  Psychosocial stressors include his impending
>           divorce, his daughter's recent illness, living
>           again with his mother.
> Axis V:   Global assessment of functioning scale is
>           estimated now at 75.
> Assessment/Plan:   This gentleman did have a major
> depressive episode earlier this summer, and he had a lot
> of anxiety at the same time.  He does have a family
> history of anxiety disorders, and perhaps depression,
> too.  He is unsure of what the problems have been, but he
> knows his grandmother and two aunts, at least, have had
> significant difficulties.  He is better because the
> situation is better, and he seems to have no problems
> with depression now.  He gets anxious when he gets around
> his wife, but he knows just to avoid her.  He feels
> better because his daughter's problem is not cancerous,
> and he feels pretty good about that.  He certainly is
> ready to return to work, and there are no psychiatric
> problems which should interfere with that.  In fact, he
> does not need to return to see me unless he has
> difficulty down the line.  I am not as concerned about
> ongoing problems with depression than a flare-up of
> excessive anxiety.  There seems to be some family history
> of that, and Mr. Watts says he will watch for that
> carefully.  If he does have problems, he will call me.

11

> In the meantime, there really is no reason to return to
> see me, and he is released to go back to work.

(Tr. at 208.)

On November 14, 2001, Claimant was admitted to Logan General Hospital with complaints of nervousness, weakness, and a crying episode while at work.  (Tr. at 160-71.)  Pam Butcher, D.O. diagnosed hypokalemia (disorder of potassium concentration) and anxiety/panic disorder.  She discharged Claimant with instructions to see Dr. Walker, a psychiatrist, in Charleston.  (Tr. at 164.)

On November 19, 2001, Claimant was admitted to Williamson Memorial Hospital with complaints of anxiety.  (Tr. at 172-77.) Thomas Hamilton, M.D. diagnosed "anxiety attack." (Tr. at 172.)  A form is checked indicating severity is "severe" and the context is "stress" and "divorce."  (Tr. at 174.)

Mark N. Casdorph, D.O., a psychiatrist with Family Psychiatric Services, stated in a letter to Disability Determination dated December 5, 2003, that Claimant was prescribed Effexor XR and Neurontin.  He further stated that Claimant had been "under his care since January 2002 and has been diagnosed with Major Depressive Disorder, Anxiety Disorder, not otherwise specified." (Tr. at 190.)  A nearly identical letter is dated November 11, 2002.  (Tr. at 195.)

The record also contains handwritten largely illegible progress notes from Drs. Casdorph and Walker, both of Family Psychiatric Services, dated November 15, 2001, November 21, 2001,

January 8, 2002, March 6, 2002, May 1, 2002, June 17, 2002, August 16, 2002, August 29, 2002, September 12, 2002, December 12, 2002, and March 3, 2003.  (Tr. at 193-205.)

D. Lynn Lewis, M.A., LPC, LCSW, a psychotherapist, stated in a letter to Disability Determination dated January 7, 2004, that Claimant had been receiving treatment at Family Psychiatric Services "from September 2001 to the present for both depression and related anxiety disorder.  He has been unable to work and has currently applied for disability.  He continues to receive medication and psychotherapy from Dr. Mark Casdorph and myself.  We anticipate he will need further treatment for his emotional problems."  (Tr. at 189.)  A nearly identical letter is dated March 26, 2003.  (Tr. at 192.)

On February 5, 2004, Claimant experienced an anxiety attack at to Williamson Memorial Hospital while taking his girlfriend to the hospital for observation.  (Tr. at 214-19.)  Claimant was medicated and instructed not to drive while medicated.  Claimant elected to stay with his girlfriend, who was admitted.  (Tr. at 216.)

On February 24, 2004, Angela Glick, M.A., a licensed psychologist, provided a psychological assessment of Claimant upon referral by the WV Disability Determination Section.  (Tr. at 228-33.)  Ms. Glick concluded:

> Diagnoses:
> Axis I:   296.22 Major Depressive Disorder,
>           Single Episode, Recurrent
>           300.02  Panic Disorder with Agoraphobia

Axis II:  V71.09  No Diagnosis
Axis III: Back pain and high blood pressure per claimant
          report.

Diagnostic Rationale:

The diagnosis of Major Depressive Disorder, Single Episode, Recurrent was made based on the claimant's report of poor eating and sleeping patterns, less energy, less interest in activities, a bad mood, crying spells, review of records indicating a previous diagnosis of major depressive disorder, a current anti-depressant prescription and observation of deficient concentration, and lability of mood with restricted affect.  The diagnosis of Panic Disorder with Agoraphobia was also made based on claimant's report of discrete periods of discomfort during which he feels like he is having a heart attack, choking, light-headedness, and fear of losing control.  Agoraphobia was used as a specifier based on his reported difficulty being in crowds.

Daily Activities:

Typical Day:  The claimant reported getting up at approximately 8:00 a.m. He stated that most days he will "watch a lot of television.  My boy gets off the bus around 3:00 p.m. and I enjoy my boy.  He usually stays with me a few days." He added, "if my back ain't hurtin' I get out and see my mother." He reported retiring at approximately 11:00 p.m... He is unable to complete any daily responsibilities.  Tasks such as preparing meals, grocery shopping, and household chores are completed by his girlfriend.   Finances are also managed by the claimant's girlfriend.  The claimant reported no hobbies.

Social Functioning:  Forms of social interaction that the claimant is involved in include visiting family three times a week.  He stated he has a fear of being in crowds and financially cannot afford to socialize.  He does not attend church.   He is not involved in any other community-based activities.

Capability:  If granted benefits, the claimant is capable of managing his own finances.

(Tr. at 232-33.)

     On March 19, 2004, a State Agency medical source completed a Psychiatric Review Technique form and opined that Claimant had affective disorders, anxiety-related disorders and major depressive disorder. Claimant had mild restriction of activities of daily

living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and no episodes of decomposition.   The evaluator, James Binder, M.D. concluded the evidence did not establish the presence of "C" criteria.  (Tr. at 247-60.)

On March 19, 2004, a State Agency medical source completed a Mental Residual Functional Capacity Assessment and opined Claimant was not significantly limited in understanding and memory.  (Tr. at 261-263.)  The evaluator, Dr. Binder, also found Claimant was not significantly limited in sustained concentration and persistence, with the exception that he was moderately limited in the ability to maintain attention and concentration for extended periods.   In social interactions, Dr. Binder concluded Claimant was not significantly limited in most areas but was moderately limited in the ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticism from supervisors.  In adaptation, Claimant was found to be not significantly limited in the ability to respond appropriately to changes in the work setting and to be aware of normal hazards and take appropriate precautions.  However, in the ability to travel in unfamiliar places or use public transportation and in the ability to set realistic goals or make plans independently of others, Claimant was found to be moderately limited.  (Tr. at 262-63.)  Dr. Binder concluded:

> This claimant has significant anxiety and depression. He
> previously worked in a mine for 26 years.  His ADLS
> [activities of daily living] are restricted and he is in
> counseling as well as necessary medication rx
> [prescribed] because of the severity of his symptoms.
> His MSE (2/24/04) [mental status evaluation] was
> relatively normal other than a restricted affect.  The
> preponderance of evidence suggests he would be able to
> learn and perform basic work-like tasks with the above
> limitations.

(Tr. at 263.)

On May 15, 2004, a State Agency medical source completed a

Psychiatric Review Technique form and opined that Claimant had

affective disorders, anxiety-related disorders and major depressive

disorder.  Claimant had mild restriction of activities of daily

living, moderate difficulties in maintaining social functioning and

maintaining concentration, persistence or pace, and no episodes of

decomposition.  The evaluator, Debra L. Lilly, Ph.D. concluded the

evidence did not establish the presence of "C" criteria.  (Tr. at

281-94.)

On May 15, 2004, Dr. Lilly also completed a Mental Residual

Functional Capacity Assessment and opined Claimant was not

significantly limited in understanding and memory.  (Tr. at 295-

97.)  Claimant was not significantly limited in sustained

concentration and persistence, with the exception that he was

moderately limited in the ability to perform activities within a

schedule, maintain regular attendance, and be punctual within

customary tolerances and the ability to complete a normal workday

and workweek without interruptions from psychologically based

16

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In social interactions, Dr. Lilly concluded Claimant was not significantly limited in most areas but was moderately limited in the ability to interact appropriately with the general public and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. In adaptation, Claimant was found to be moderately limited in the ability to respond appropriately to changes in the work setting and in the ability to travel in unfamiliar places or use public transportation. He was found to be not significantly limited in the ability to set realistic goals or make plans independently of others and the ability to be aware of normal hazards and take appropriate precautions. (Tr. at 262-63.) Dr. Lilly concluded:

> This is a forty-eight year old male who alleges panic disorder. His treating source proposes the diagnosis of anxiety disorder, NOS [not otherwise specified]. However, he reports interaction with others. With severe stress, he may require intervention to reduce symptoms. He retains the ability to perform a variety of activities in a low stress environment.

(Tr. at 297.)

Records indicate Claimant received services at Logan-Mingo Area Mental Health, Inc. from August 9, 2004 through August 30, 2005 (approximately twenty-seven sessions). (Tr. at 322-66.) A report dated August 9, 2004 and signed by Walter C. Wilson, MS, therapist, and Donna J. Cooke, MA, psychologist, states that

Claimant is a self-referral and had been

> treated by Family Psychiatric Services of Charleston for
> nearly three years until recently they declined to take
> Medicaid patients... Mr. Watts says his problem is
> 'panic attacks, anxiety, crying spells, which began three
> years ago.' Further investigation shows that the problem
> began at work about three years [ago]. While at work,
> client became real nervous, shaking, freezing, couldn't
> get up and so the personnel had to get an ambulance for
> him. He worked for Hobert Mine. After this incident,
> was off work for eight months, went back to work for two
> months and could not continue. It appears this emotional
> reaction was a cumulation of things including: his wife
> having an affair with next door neighbor and friend (the
> Watts married 24 years), brother heart attack, daughter
> had cancer (OK now), mom had stroke. Watts said, "I
> tried to go back to work two times - they told me to go
> sign up for SSDI." Add to this stress, Mr. Watts
> apartment in Delbarton was flooded recently and he lost
> what he had left from the divorce.

(Tr. at 339.)

> The evaluators also made the following observations:

> When the interview began, this client began shaking
> badly, was extremely nervous, left hand shaking, as was
> the left foot. He was wringing his hands and looking
> away at the floor and wall... I had to stop the interview
> and work hard with relaxation techniques to get him calm
> enough to continue and conduct the rest of the session.
> Once he settled down, he stayed relatively calm... He
> participated in our interview, was polite, emotional at
> times, answered questions, and appears reliable.
> Therapist's Assessment of Client: This is a likeable
> fellow who is in need of treatment for his emotional
> problems. Life has been out of control for him and his
> anxiety overtakes him. He reports, "I am better on
> medicine." Mr. Watts is not suicidal, homicidal or
> psychotic.
> Axis I:   296.32 [major depressive disorder]
> Secondary 300.02 [generalized anxiety]
> Axis II:  V71.09
> Axis III: V71.09
> Axis IV:  6
> Axis V:   60
> Recommendation:  Client to see Dr. Thambidurai for an

> evaluation and assessment on September 14, and begin
> psychotherapy with me on August 26 and then September 10.
> Consider Vocational Rehab down the road when he is more
> stable.

(Tr. at 342.)

An August 30, 2004 progress note from Logan-Mingo Area Mental Health, Inc. indicated Claimant continues to be regularly treated for depression and anxiety:  "Albert has been compliant in TP [treatment plan].  Treatment has not been effective at reducing symptoms, including feeling hopeless, helpless from severe (4) to moderate (3)."  (Tr. at 322.)  A July 14, 2005 progress note states that Claimant "got married on 4th July.  Wife Rachael found lump in breast.  They called and has (sic) to go back next week to Huntington."  (Tr. at 323.)

On January 1, 2005, Claimant presented to the emergency department of Williamson Memorial Hospital with symptoms of nervousness and anxiety.  Claimant was evaluated, medicated, and instructed to follow up with Dr. Hussain Imitiaz in two to three days. (Tr. at 302-09.)

<u>Discussion</u>

While the parties to this case filed no briefs challenging the ALJ's decision, the undersigned finds that a review of the evidence reveals (1) the ALJ failed to fully consider the extent of Claimant's mental impairments and erroneously found that Claimant's affective disorders were of less than two years duration and caused only minimal limitations on his ability to work; and (2) the ALJ

19

failed to completely consider Claimant's nonexertional mental limitations and their impact on his ability to work. The ALJ erred in reaching conclusions without reliance on any vocational resource, whether it be a publication such as the Dictionary of Occupational Titles or vocational expert testimony. In this case, expert testimony was necessary to prove whether, despite the combination of his exertional and nonexertional impairments, Claimant is capable of work.

ALJ's Findings Regarding Mental Impairments

The ALJ determined that Claimant suffers from the severe impairments of depression, anxiety, sleep apnea, and degenerative disc disease. (Tr. at 15.) The ALJ found that the Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. §§ 404.1520(d) and 416.920(d). (Tr. at 17.) The ALJ's entire discussion of this finding is brief and cursory:

> Mr. Watts' depression and anxiety disorders, evaluated under sections 12.04 and 12.06 of Appendix 1, respectively, have resulted in only a mild restriction of activities of daily living, moderate difficulty maintaining social functioning and concentration, persistence and pace, and no episodes of decompensation of extended duration. There is no evidence of a medically documented history of an affective disorder of at least two years' duration that has caused more than a minimal limitation of his ability to do any basic work activity or the complete inability to function independently outside of a highly the area of his home (sic). The claimant's musculoskeletal/spinal impairment, evaluated under section 1.04 of Appendix 1, has not resulted in an inability to ambulate effectively, as defined in section 1.00B2b of Appendix 1.

20

(Tr. at 17.)

The court finds that the ALJ's conclusion that "[t]here is no evidence of a medically documented history of an affective disorder of at least two years' duration that has caused more than a minimum limitation of his ability to do any basic work activity or the complete inability to function independently outside of a highly the area of his home (sic)..." - to be both erroneous and nonsensical.

First, the medical evidence clearly shows Claimant has suffered from the affective disorders of major depressive disorder and anxiety disorder in excess of two years that caused more than a minimum limitation on his ability to work.  The first medical evidence of these disorders is the September 20, 2001 evaluation of Dr. Walker.  (Tr. at 208.)  While Dr. Walker released Claimant to return to work, Claimant had another episode of anxiety/panic disorder resulting in collapse and uncontrolled crying while at work on November 14, 2001, which required transportation to the emergency department at Logan General Hospital.  (Tr. at 160-71.)

Medical evidence shows Claimant received consistent psychiatric care from that time through 2002, 2003, and 2004 at Family Psychiatric Services.  (Tr. at 189, 190, 192, 193-205.) Claimant continued to receive psychiatric care at Logan-Mingo Area Mental Health, Inc. in 2004 and 2005 after Family Psychiatric Services ceased to treat Medicaid patients. (Tr. at 322-66.)

Also, while the ALJ states Claimant had "no episodes of decompensation of extended duration" the court finds this conclusion does not tell the full story of Claimant's mental impairment. In addition to the November 14, 2001 episode, Claimant was treated at hospitals on November 19, 2001, February 5, 2004 and January 1, 2005 for anxiety and panic attacks. (Tr. at 172-77, 214-19, 302-09.)

Additionally, a particularly telling progress note from Logan-Mingo Area Mental Health, Inc. indicates Claimant's depression and anxiety disorders continue to be problematic: "Albert has been compliant in TP [treatment plan]. Treatment has not been effective at reducing symptoms, including feeling hopeless, helpless from severe (4) to moderate (3)." (Tr. at 322.)

The court finds the ALJ failed to fully consider the extent of Claimant's mental impairments and erroneously found that Claimant's affective disorders were of less than two years duration and caused only minimal limitations on his ability to work.

ALJ's Findings Regarding Claimant's Mental Impairments and their Impact on Claimant's Residual Functional Capacity

The ALJ found that Claimant retains the residual functional capacity to perform medium work, that he is a "younger individual" under the regulations but would be 50 years old on December 24, 2005, at which time he would be classified as an individual closely approaching advanced age, has completed two years of college, and

22

his past relevant work was as a heavy equipment operator and as a car salesman.  (Tr. at 18-19.)  The ALJ concluded:

> The ability to perform medium work leads to the determination that he can also do light or sedentary work.  Despite his symptoms of depression and anxiety, the claimant has the mental residual functional capacity to perform the basic mental demands of unskilled, competitive work on a sustained basis.  He can maintain sufficient attention and concentration to understand, remember and carry out simple instructions, sustain a routine, and maintain regular attendance at a job site. He has no more than moderate limitations on his ability to interact appropriately with the general public and supervisors, and his ability to do so is not precluded by those limitations.

(Tr. at 18.)

After making those findings, the ALJ found that the claimant is able to work at jobs which exist in significant numbers in the national economy per 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), 414.966.  (Tr. at 20.)

The ALJ found:

> In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Rules of Appendix 2, Subpart P, Regulations No. 4.

> If Mr. Watts had no nonexertional limitations and had the residual functional capacity to perform the full ranged of medium work, considering his age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rules 203.29 and 203.22.  The undersigned finds that, despite his symptoms of depression and anxiety, the claimant has the residual functional capacity to perform the basic mental demands of competitive work are (sic) on a sustained basis.  He can maintain sufficient attention and concentration to understand, remember and carry out detailed instructions,

23

sustain a routine and maintain regular attendance at a jobsite, and no more than moderate limitations on his ability to interact appropriately with the general public and supervisors. Inasmuch as the claimant's nonexertional limitations have little effect on the occupational base of unskilled medium work, a finding of "not disabled" is appropriate under the framework of these rules.

(Tr. at 20.)

In making this finding, the ALJ relied almost exclusively on the nonexamining expert sources and cited only one observation from a treating source: "Dr. Walker, his treating psychiatrist, noted on December 12, 2003 [sic; 2002] that the claimant was working 150 head of cattle without problems or anxiety (Exhibit B-6F), which contradicts the claimant's testimony that he was so overwhelmed with anxiety that he could not do what he needed to do for the cattle." (Tr. at 19.)

The court has read the entire Exhibit B-6F which contains the records of Family Psychiatric Services, and notes that those records overwhelmingly conclude Claimant continued to struggle with his mental disorders during his nearly three years of treatment there. (Tr. at 189-208.) Also, the January 7, 2004 letter of D. Lynn Lewis, Claimant's treating psychotherapist, states Claimant "has been receiving services from September 2001 to the present for both depression and related anxiety disorder. He has been unable to work...continues to receive medication and psychotherapy from Dr. Mark Casdorph and myself. We anticipate he will need further treatment for his emotional problems." (Tr. at 189.)

24

Also, the court notes that the ALJ seems to ignore his earlier findings in his discussion of Claimant's severe impairments.  There the ALJ cites Logan-Mingo Mental Health's treating therapist Walter C. Wilson's, and treating psychologist Donna J. Cooke's August 30, 2005 progress notes that "treatment had not been effective at reducing his symptoms.  His Global Assessment of Functioning (GAF) was estimated to be at 60, which is indicative of moderate symptoms according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DMS-IV-TR)(Exhibit B-23F, page 21)." (Tr. at 16.)

Under the circumstances presented in this case, the ALJ's reliance on the Medical-Vocational Guidelines or the "Grids," as they are commonly referred to, is improper.  The regulations explicitly provide that the Grids "are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations, e.g., certain mental, sensory, or skin impairments."  20 C.F.R. pt. 404, subpt. P, app. 2 § 204.00(e) (1999).

Consistent therewith, in Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983), the United States Court of Appeals for the Fourth Circuit held that the ALJ in that case erred because he applied the Grids, despite the fact that the Claimant suffered from the

exertional impairment of hemiparesis, coupled with nonexertional impairments of low intelligence and impaired dexterity. The court reasoned that

> the regulations provide that the grids may not be conclusively applied where nonexertional impairments exist in tandem with exertional limitations; instead individualized consideration must be given. *** Manifestly, if [claimant] demonstrates the presence of nonexertional impairments, the Secretary, in order to prevail, must be required to prove by expert testimony that, despite [claimant's] combination of nonexertional impairments, specific jobs exist in the national economy which he can perform.

Id.

In the instant case, the ALJ found that Claimant's depression, anxiety, and sleep apnea disorders are "severe" impairments, or ones that significantly limits Claimant's ability to do basic work activities. 20 C.F.R. § 416.920(c) (1999). Depression and anxiety disorders clearly are mental disorders, i.e., nonexertional impairments that can result in exertional or nonexertional limitations. Yet, the ALJ's decision makes only a cursory mention of the limitations that have resulted from these severe mental impairments. Moreover, the ALJ failed to call a vocational expert to prove whether, despite the combination of his exertional and nonexertional impairments, Claimant is capable of work.

It is further noted that while the ALJ refers to the State agency consultants reports to show Claimant had only "mild limitations," he failed to note that the May 15, 2004 Mental Residual Functional Capacity Assessment of Dr. Lilly, specified

26

that claimant would need employment in a "low stress environment." (Tr. at 19, 297.)

The ALJ does not seem to consider the "record as a whole" and discusses only selective evidence negative to Claimant, or gives more weight to certain evidence without stating specifically why it is more credible.  Raney v. Barnhart, 396 F.3d 1007, 1009 (8th Cir. 2005) ("[Judicial] review of a decision of the Commissioner . . . in a disability benefits case is limited to determining whether the Commissioner's decision is supported by substantial evidence on the record as a whole."). While not required to discuss every piece of evidence, an ALJ should discuss evidence that, if believed, could lead to a finding of disability.  Barrett v. Barnhart, 355 F.3d 1065, 1068 (7th Cir. 2004); 20 C.F.R. § 404.1523 (2005); Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003) (per curiam); Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) (Determination of whether susbtantial evidence supports decision in social security disability case requires reviewing court to consider not only evidence in the record that supports Commissioner's determination, but also any evidence that detracts from that conclusion.); Randall v. Sullivan, 956 F.2d 105, 109 (5th Cir. 1992) (In reviewing the Social Security Commissioner's denial of Supplemental Security Income (SSI) benefits for a disability, the court may not examine only the evidence favorable to the Commissioner; it must also examine contrary evidence.); Clifton v.

Chater, 79 F.3d 1007, 1010 (10th Cir. 1996) ("In addition to discussing the evidence supporting his decision in a social security disability benefits case, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.").

In summary, substantial evidence of record reveals that Claimant suffers from nonexertional impairments that cause various nonexertional limitations. As such, the ALJ should have addressed fully these nonexertional impairments and any resulting limitations and called a vocational expert to testify at the administrative hearing about the impact of Claimant's nonexertional limitations on his ability to work. Because of the ALJ's omission in this regard, the court finds that the Commissioner's decision denying benefits is not supported by substantial evidence and that further proceedings are required.

Accordingly, by Judgment Order entered this day, this matter is REVERSED and REMANDED for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER:  March 10, 2009

Mary E. Stanley
United States Magistrate Judge

28